**BASIC ENERGY SERVICE, INC., Appellant,**

v.

**D–S–B PROPERTIES, INC., The Oleta Ashworth Foster Living Trust and Robert Radloff and Margaret Radloff, Co–Trustees, Appellees.**

No. 12–10–00005–CV.

Court of Appeals of Texas, Tyler.

Nov. 23, 2011.

M. Keith Dollahite, James A. Payne, Jr., J. Keith Stanley, for Appellant.

Deborah J. Race, Jack Wesley Hill, Gregory D. Smith, Deron R. Dacus, Andrew W. Stinson, for Appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

### OPINION ON REHEARING

JAMES T. WORTHEN, Chief Justice.

Basic Energy Services, Inc. filed a motion for rehearing, which is overruled.

The Oleta Ashworth Foster Trust and the co-trustees of that trust, Robert Radloff and Margaret Radloff also filed a motion for rehearing, which is overruled. The court's opinion of June 30, 2011, is withdrawn and the following opinion is substituted in its place.

Basic Energy Services, Inc. appeals the trial court's judgment and award of damages in favor of Appellee, D–S–B Properties, Inc., and Intervenors, The Oleta Ashworth Foster Trust and the co-trustees of that trust, Robert Radloff and Margaret Radloff. Basic raises seven issues on appeal.[1] We modify the judgment and, as modified, affirm in part, and reverse and render in part.

### BACKGROUND

The B.M. Moseley # 1 oil well located in the area overlying the Paluxy Formation in Smith County, Texas, was drilled and began producing oil in 1946. From that time, the well continued to produce oil. In 1993, a group of six investors acquired the Moseley # 1 well and two other wells through the purchase of two leases for $240,000. In this transaction, D–S–B Properties, Inc. (DSB) was named as the purchaser. Following the purchase, DSB assigned all of its interest in the leases and wells to the six investors. The investors (working interest owners) entered into an operating agreement with DSB by which DSB became the operator of the wells.

In September 2007, the well went off production. DSB hired Basic Energy Services, Inc. (Basic) to repair the well. Basic determined that the problem was related to a tubing leak. DSB's president, Brian Hancock, instructed Basic to find someone to test the tubing.

---

1. Basic has not numbered its issues. We have grouped its argument into seven issues.

Basic used its derrick to pull the rods utilized by the well's pump out of the tubing. Next, Basic pulled the entirety of the tubing out of the wellbore. Subsequently, a third party was brought in to test the tubing. The testing crew inserted a pressure testing tool inside two joints of tubing at a time. Thereafter, Basic's crew lowered the joints back into the wellbore, and the testing crew used high pressure water to pressurize the joints, at which time the tubing would either reveal a leak or hold pressure. If no leak was found, the Basic crew added another two joints and the testing crew repeated the testing procedure.

During the testing process, the testing company's tool became stuck inside the tubing. After the tool became stuck, Basic's crew latched onto the two joints in the hole and pulled them up so that they could set the slips, which were designed to hold the tubing in place. The testing crew then pulled on the stuck tool to free it. When they freed the tool, the tubing bounce[d] and ratcheted violently all the way down the well. As a result, several joints of tubing broke free and fell down the wellbore.

Basic's crew successfully retrieved some, but not all, of the tubing that had fallen down the well. Basic hired another company to fish out the remaining joints of tubing. Ultimately, the efforts to retrieve the remaining tubing were unsuccessful, and the parties agreed that the well was irreparably damaged. Because the production of oil had ceased and the working interest owners elected not to engage in drilling or reworking operations, the lease terminated in December 2007.

DSB, acting as representative of the working interest owners, filed the instant suit against Basic on November 5, 2007. In its petition, DSB alleged that Basic was liable to it because Basic's negligence caused severe damage to the Moseley # 1 well. As a result, DSB alleged that it was entitled to recover actual damages, special damages, interest, costs, and attorney's fees. The Oleta Ashworth Foster Trust and the co-trustees of that trust, Robert and Margaret Radloff (the royalty owner), later intervened raising causes of action for negligence, breach of warranty, and violations of the Texas Deceptive Trade Practices Act (DTPA). The royalty owner further alleged that it had suffered damages in the form of lost royalties as a result of Basic's actions. Basic filed a Motion to Show Authority, in which it alleged that DSB did not have authority to file the lawsuit and act on behalf of the working interest owners.[2]

The matter proceeded to a bench trial. Ultimately, the court found Basic liable to DSB and awarded DSB $1,911,957 in damages. The trial court further found Basic liable to the royalty owner and awarded the royalty owner $71,203 in damages as well as attorney's fees. Thereafter, the trial court filed findings of fact and conclusions of law. This appeal followed.

### STANDING AND CAPACITY

■ In its first issue, Basic argues that DSB did not have standing to bring suit for damage caused to the well on behalf of the working interest owners because it has no justiciable interest in the controversy based on damage to the well. DSB responds that Basic confuses the issue of standing with that of capacity. It further

---

2. Further, in its fourth amended answer, Basic alleged under oath, pursuant to Texas Rule of Civil Procedure 93, that DSB did not have the legal capacity to sue and was not entitled to recover in the capacity in which it sued Basic. DSB abandoned its motion to show authority and its pleading of the capacity defense at the pretrial conference.

argues that each of the working interest owners gave it written consent to represent their interest in pursuing a claim in litigation against Basic for damage caused to the well.

### Standing

A plaintiff must have both standing and capacity to bring a lawsuit. *Coastal Liquids Transp. L.P. v. Harris Cnty. Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex. 2001); *R & R White Family Ltd. P'ship v. Jones*, 182 S.W.3d 454, 457 (Tex.App.-Texarkana 2006, no pet.). Standing is implicit in the concept of subject matter jurisdiction, which is essential to the authority of a court to decide a case. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex.1993). Subject matter jurisdiction is never presumed and cannot be waived. *Id.*

Whether a court has subject matter jurisdiction is a question of law. *Hendee v. Dewhurst*, 228 S.W.3d 354, 366 (Tex.App.-Austin 2007, pet. denied). The determination of whether a trial court has subject matter jurisdiction begins with the pleadings. *Id.* The pleader has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Id.* Whether the pleader has met its burden is a question of law that we review de novo. *Id.* When an appellate court questions jurisdiction for the first time on appeal, it must construe the petition in favor of the party, and, if necessary, review the entire record to determine if any evidence supports standing. *Tex. Air Control Bd.*, 852 S.W.2d at 446.

The general test for standing in Texas requires that there (1) shall be a real controversy between the parties, which (2) will be actually determined by the judicial declaration sought. *See Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex.1996) (cit-ing *Tex. Air Control Bd.*, 852 S.W.2d at 446). Standing pertains to a person's justiciable interest in a suit and is a component of subject matter jurisdiction. *See Tex. Air Control Bd.*, 852 S.W.2d at 443, 445–46. A controversy is justiciable only if there exists a real and substantial controversy involving a genuine conflict of tangible interests and not merely a theoretical dispute. *See Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex.1995).

In the case at hand, DSB pleaded its causes of action against Basic, in pertinent part as follows:

> Plaintiff brings this suit as operator of the BM–Moseley # 1 oil well and as representative of all working interest owners therein under the terms of the Joint Operating Agreement and by election of all working interest owners. . . .
>
> . . . .
>
> Since approximately October 2, 2007, Defendant has abandoned its remedial efforts, inquired about shifting costs for these efforts to Plaintiff, and [has] left Plaintiff with an irreparably damaged, non-producing BM–Moseley # 1 well. Because of this loss of production caused by Defendant's deficient services and the inability to restore production, Plaintiff risks losing its mineral leases for the BM–Moseley # 1 in the near future.
>
> . . . .
>
> As described above, Defendant breached its duty of care[,] which proximately caused severe damage to BM–Moseley # 1 well and a cessation of production necessary to maintain Plaintiff's leasehold interests into the future. As a result of this breach, Plaintiff seeks unliquidated damages within the jurisdictional limits of this Court. Such damages include, but are not limited to, the cost to repair the well, the cost to reproduce the well, the cash market value of

the well, and/or the cost of any environmental protection or remediation resulting from the damage to the well.

. . . .

As described above, Defendant failed to perform these services in a good and workmanlike manner[,] which directly and proximately caused severe damage to [the] BM–Moseley #1 well and a cessation of production necessary to maintain Plaintiff's leasehold interests into the future. Such damages include, but are not limited to, the cost to repair the well, the cost to reproduce the well, the cash market value of the well, and/or the cost of any environmental protection or remediation resulting from the damage to the well.

Basic relies heavily on *Elizondo v. Tex. Natural Res. Conservation Comm'n*, 974 S.W.2d 928, 931 (Tex.App.-Austin 1998, no pet.), in support of its argument that DSB lacked standing to bring suit as representative for the working interest owners. In *Elizondo*, Mildred Elizondo, individually and on behalf of those she is authorized to represent, filed suit challenging the Texas Natural Resource Conservation Commission's final order regarding actions it was taking to divert water. *Id.* at 930. The trial court sustained the Commission's plea to the jurisdiction on three bases, one being that Elizondo did not have standing to bring the action on behalf of the affected landowners. *Id.* After the trial court sustained the plea, Elizondo filed a Plaintiff's [singular] Notice of Appeal. *Id.* at 930–31. The court of appeals held that (1) Elizondo's appointment as attorney-in-fact by powers of attorney from ten family members did not authorize her to bring suit on behalf of the ten individuals in her own name in a representative capacity and (2) even if she were authorized to bring suit in a representative capacity, she did not perfect appeal in that capacity. *Id.* at 931.

In reaching its decision, the court in *Elizondo* relied on *Tinsley v. Dowell*, 87 Tex. 23, 26 S.W. 946, 948 (1894), for the proposition that, in Texas, an agent cannot bring a suit in his own name for the benefit of the principal. *Id.* However, the Fourteenth Court of Appeals distinguished *Tinsley* on that proposition. *See AVCO Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 652–53 (Tex.App.-Houston [14th Dist.] 2007, pet. denied); *see also Rodarte v. Investeco Group, L.L.C.*, 299 S.W.3d 400, 406 (Tex.App.-Houston [14th Dist.] 2009, no pet.). In so doing, the court noted that *Tinsley* involved an agent suing on his own behalf, not for the benefit of the principal. *AVCO*, 251 S.W.3d at 653.

Here, DSB specifically stated in its pleadings that it asserted claims on its own behalf as operator and as representative of all working interest owners. There is no dispute concerning whether the working interest owners have a justiciable interest in these claims. Accordingly, we hold that DSB had standing to file suit as a representative of the working interest owners. *See Rodarte*, 299 S.W.3d at 406.

### Capacity

The scope of DSB's authority to represent the working interest owners is a question of capacity, not standing. Capacity concerns a party's personal right to come into court, while standing concerns the question of whether a party has an enforceable right or interest. *Id.* at 407 (quoting *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex.2005)). A plaintiff with no legally cognizable interest in the outcome of the case lacks standing to sue on its own behalf, but may be authorized to sue on behalf of another. *See Nootsie, Ltd.*, 925 S.W.2d at 661. Capacity must be challenged by a verified pleading, or it is waived. *See* Tex.R. Civ. P. 93; *Pledger v. Schoellkopf*, 762 S.W.2d 145, 145–46 (Tex.1988) (contention that corpo-

ration rather than plaintiff shareholder owned fraud and tortious interference claims challenged capacity to sue and was waived); *Jones,* 182 S.W.3d at 457.

Here, Basic has made several arguments concerning standing that could be construed as relating to the issue of capacity. Basic attempted to plead the defense of capacity in its fourth amended answer. DSB moved to strike this pleading. At the pretrial conference on October 1, 2008, Basic informed the court that it was abandoning its pleading and its motion to show authority. Because Basic abandoned the pleading and motion in which it challenged DSB's capacity, it has waived the issue. *See* TEX.R. CIV. P. 93; *Pledger,* 762 S.W.2d at 145–46; *Jones,* 182 S.W.3d at 457.

Basic's first issue is overruled.

### DAMAGES AWARDED TO *DSB*

■ In its second issue, Basic argues that there is not sufficient evidence to support the trial court's award of damages to DSB. Specifically, Basic contends that DSB's expert, Robert Ungerecht, did not use the correct time frame to calculate the cost to reproduce the well.

■ The measure of damages for the destruction of an oil well that can be reproduced is the lower of two values: (1) the cash market value of the old well or (2) the cost of reproducing the well with a new well equipped like the old one, less any salvage value of the old well. *See Atex Pipe & Supply v. Sesco Prod. Co.,* 736 S.W.2d 914, 917 (Tex.App.-Tyler 1987, writ denied). On appeal, Basic cites *Victory Truck Lines v. Brooks,* 218 S.W.2d 899, 900 (Tex.Civ.App.-Texarkana 1948, no writ), in support of its contention that the correct time frame for determining the

cost to reproduce the well is the time of the injury to the old well, i.e., September 2007. According to Basic, Ungerecht calculated the replacement cost of the well using a legally incorrect time frame because he used his June 30, 2008 calculations for replacement cost and used a 10% discount factor to estimate the lower price when calculating that cost as of the September 2009 trial date. Thus, Basic concludes that because the trial court did not have a correct calculation of reproduction cost, it could not determine which value, the market value or the cost to reproduce, was the lower amount, and, therefore, the correct award to be made.

In response, DSB argues that Basic failed to preserve error because Basic's objections at trial do not comport with the argument underlying its second issue. Accordingly, we first consider DSB's contention that Basic failed to preserve error.[3]

■ A legal sufficiency challenge may be preserved by (1) a motion for directed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to submitting an issue to the jury, (4) a motion to disregard a jury finding on an issue, or (5) a motion for new trial. *See Cecil v. Smith,* 804 S.W.2d 509, 511 (Tex. 1991); *C.M. Asfahl Agency v. Tensor, Inc.,* 135 S.W.3d 768, 786 (Tex.App.-Houston [1st Dist.] 2004, no pet.). On the other hand, there is only one way to preserve a factual sufficiency challenge: include the complaint in a motion for new trial. *See In re C.E.M.,* 64 S.W.3d 425, 428 (Tex. App.-Houston [1st Dist.] 2000, no pet.).

In its motion for instructed verdict, Basic argued, in pertinent part, as follows:

[T]he testimony of Plaintiff's expert offered no credible testimony regarding

---

**3.** *See* TEX.R.APP. P. 33.1(a) (preservation of error a prerequisite to presenting complaint for appellate review); *In re M.S.,* 115 S.W.3d 534, 547 (Tex.2003) (error preservation is threshold to appellate review).

damages. In fact, as with his other testimony, this testimony was conflicting. On direct examination, he testified to damages totaling approximately $1.7 million based upon various factors set forth in his report produced in 2008. However, on cross-examination, he acknowledged a substantial differential in those factors, primarily due to changes in market forces. He did not, however, recalculate his damages evaluation based upon these admitted cost changes. Consequently, his damages evaluation is unreliable and cannot form the basis of a verdict in Plaintiff's favor.

In its reply brief, Basic asserts that it preserved its second issue by its written objections to the trial court's findings of fact and conclusions of law and motion to modify, correct, or reform the trial court's judgment. There, Basic argued, in pertinent part, as follows:

> The evidence is legally insufficient to support any finding that: [t]he reasonable cash market value of the BM–Moseley # 1 well immediately before its destruction, less any salvage value, was $3,661,000.00. The reasonable cost to reproduce the well is $1,118,250.00. Because of the substantial risk of the failure involved in attempting to reproduce this Paluxy sand well, a risk adjustment of $366,100.00 is appropriate. The total cost to abandon and restore the well site and accompanying salt water disposal well, less equipment salvage, is $105,000.00. Upon cross-examination, Plaintiff's economics expert conceded that his financial evaluation of damages was incorrect and not based upon valid economic conditions. He acknowledged that the recent downturn in the oil and gas industry had caused a significant reduction in costs associated with oil well operations. As such, the opinions he provided and that the Court relied on cannot justify an award of damages.

Finally, Basic filed a motion for new trial in which it made an identical contention to the aforementioned argument made in its objections to the trial court's findings of fact and conclusions of law, save that the contention in its motion for new trial was directed at the issue of factual sufficiency.

■■■ To preserve issues of legal and factual insufficiency, an appellant is required to adequately apprise the trial court of the alleged deficiencies in such a way that its objection can be clearly identified and understood. *See* TEX.R.APP. P. 33.1(a); *Wal–Mart Stores, Inc. v. McKenzie,* 997 S.W.2d 278, 280 (Tex.1999); *Cecil,* 804 S.W.2d at 510–11; *Arroyo Shrimp Farm, Inc. v. Hung Shrimp Farm, Inc.,* 927 S.W.2d 146, 150–51 (Tex.App.-Corpus Christi 1996, no writ); *see also Lake v. Premier Transp.,* 246 S.W.3d 167, 174 (Tex.App.-Tyler 2007, no pet.) (objection must be specific enough to enable trial court to understand precise nature of error alleged); *Samedan Oil Corp. v. Intrastate Gas Gathering, Inc.,* 78 S.W.3d 425, 449–51 (Tex.App.-Tyler 2001, pet. granted, judgment vacated w.r.m.); *City of Houston v. Precast Structures, Inc.,* 60 S.W.3d 331, 335–36 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (argument to trial court on legal sufficiency did not adequately apprise it of argument subsequently made on appeal concerning probative value of expert witnesses' testimony on issue of damages); *In re C.E.M.,* 64 S.W.3d at 427–28 (general objection does not preserve sufficiency issue; objection at trial must comport with objection on appeal). Further, a motion for directed verdict shall state the specific grounds therefor. TEX.R. CIV. P. 268; *see also* TEX.R. CIV. P. 321 (each point relied upon in motion for new trial shall refer to complained of error in such a way that the objection can be clearly identified and understood by the court); TEX.R. CIV. P. 329b(g) (motion to modify, correct, or

reform judgment shall specify respects in which judgment should be modified, corrected, or reformed).

■■■ Moreover, the objection to the trial court must comport with the argument made on appeal. *See Lake,* 246 S.W.3d at 174; *In re C.E.M.,* 64 S.W.3d at 428; *Precast Structures,* 60 S.W.3d at 337–38. An objection on appeal that is not the same as that urged at trial presents nothing for review. *See Religious of the Sacred Heart of Tex. v. City of Houston,* 836 S.W.2d 606, 614 (Tex.1992); *see also Operation Rescue–Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.,* 937 S.W.2d 60, 70 (Tex.App.-Houston [14th Dist.] 1996), *aff'd as modified,* 975 S.W.2d 546 (Tex.1998) (party cannot enlarge on appeal objection made to trial court).

The crux of Basic's argument on appeal is that there is only one correct time frame to determine the cost to reproduce the well—the September 2007 date of the injury to the old well. Nowhere in its arguments to the trial court does Basic specifically reference this point of law so critical to its argument on appeal. To the contrary, Basic made only general assertions to the trial court that Ungerecht's evaluation of damages was not based upon valid economic conditions or that the downturn in the oil and gas industry had caused a significant reduction in costs associated with oil well operations. During trial, particularly during cross examination, the parties elicited testimony from Ungerecht concerning his 2008 damages calculations and the rationale of discounting those figures by 10% to account for the change in the oil producing market between the date of his calculations and the September 2009 date of trial. Faced with this testimony and given DSB's failure to specifically reference in its objection what it now contends is the appropriate time frame to determine the cost to reproduce the well, it

was reasonable for the trial court to conclude that Basic was arguing that Ungerecht's 10% discount factor between his June 2008 damage calculations and the 2009 trial date was the basis of its objection.

Preservation of error is the most fundamental step in the appellate process. Catherine Stone, *Preservation of Error: From Filing the Lawsuit Through Presentation of Evidence Foreword,* 30 St. Mary's L.J. 993, 994 (1999). It is designed to allow the judicial system to function efficiently by eliminating error that could have been corrected at the trial court had the error been pointed out in time. *See* Polly Jessica Estes, *Preservation of Error: From Filing the Lawsuit Through Presentation of Evidence,* 30 St. Mary's L.J. 997, 1092 (1999). At the same time, preservation of error ensures, in the interest of fairness, that a party is not blind-sided with a new complaint for the first time on appeal. *Id.*

In considering this issue, we have reviewed the entirety of the record and have carefully compared Basic's aforementioned arguments to the trial court with the argument it now raises on appeal. As a result, we conclude that Basic's argument to the trial court was not sufficiently specific to make the trial court aware of the argument it now makes on appeal. Therefore, we hold that Basic has waived the issue.

■■■ Basic next contends that DSB, as operator, did not have any obligation to abandon and restore the old lease because it was not a working interest owner and, thus, there was no basis for awarding costs to abandon and restore the old lease. Basic further argues that there was no basis to award DSB damages for the increased royalty burden in the new lease since it was not a working interest owner. However, as set forth above, DSB filed suit not only as operator, but also as the represen-

tative of all working interest owners. Therefore, the trial court's awards of costs to abandon and restore the old lease and increased royalty burden in the new lease could be properly made to DSB as representative of the working interest owners.

Basic's second issue is overruled.

## CHALLENGES TO FINDINGS OF FACT AND CONCLUSIONS OF LAW

In its third issue, Basic challenges each of the trial court's findings of fact and conclusions of law with regard to DSB. The stated bases of Basic's challenges are the arguments it made in support of its first and second issues. Having considered these arguments, we have overruled Basic's first and second issues. For these same reasons, we likewise conclude that Basic's challenges to the trial court's findings of fact and conclusions of law are of no moment. Basic's third issue is overruled.

## DAMAGES AWARDED TO ROYALTY OWNER

■ In its fourth issue, Basic argues that the trial court erred in awarding damages to the royalty owner for lost royalties. Specifically, Basic contends that since a royalty owner owns an interest in the formation containing oil, if there is no injury to the oil formation, there is no injury to a royalty owner. Thus, Basic concludes that allowing a royalty owner to recover damages without proving an injury to the oil producing formation results in a potential double compensation.

In support of its argument, Basic relies on *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684 (1959), as well as *HECI Exploration Co. v. Neel*, 982 S.W.2d 881 (Tex. 1998), and *Whitson Co. v. Bluff Creek Oil Co.*, 156 Tex. 139, 293 S.W.2d 488 (1956). In *Clifton*, the royalty owner argued that the working interest owners violated their covenant to reasonably develop the prem-

ises after production was obtained. *See Clifton*, 325 S.W.2d at 694. The court held that there was no evidence in the record that the royalty owner would not recover all of its undivided interest in the gas reservoir under the land involved. *Id.* The court further noted that the record did not disclose any factual or evidentiary basis upon which damages could be assessed with certainty. In *Neel*, the court recognized that a royalty owner is entitled to compensation for damage to a reservoir underlying an oil and gas lease. *See Neel*, 982 S.W.2d at 890. However, the court did not foreclose other avenues through which a royalty owner might recover damages. *See id.* Finally, the court's opinion in *Whitson* does not resolve the issue at hand. There, the court resolved the issue before it based on the appellant's failure to specifically object to the damages submission. *Whitson*, 293 S.W.2d at 492–93.

None of the case law cited by Basic in its brief serves to foreclose the award of damages to a royalty owner that, as here, has not demonstrated that the formation is damaged. However, the court's opinion in *Clifton* is helpful to our analysis of the issue before us. Specifically, we must evaluate the record to determine if it supports that (1) the royalty owner has proven that it would not recover all of its interest in the formation under the land involved and (2) the damages can be assessed with certainty. *See Clifton*, 325 S.W.2d at 694.

■ Before a plaintiff can recover damages, it must prove with reasonable certainty the damages it suffered. *See Reeder v. Wood County Energy L.L.C.*, 320 S.W.3d 433, 448 (Tex.App.-Tyler 2010, pet. filed). The value of mineral reserves is not a matter of common knowledge, and therefore it is the plaintiff's burden to prove damages by expert testimony. *See Arkoma Basin Exploration Co. v. FMF Assoc. 1990–A, Ltd.*, 249 S.W.3d 380, 388

(Tex.2008). Experienced people who are acquainted with the conditions of the land in the locality of the leased premises can give an opinion as to the amount of recoverable oil in the unit. *See Tex. Pac. Coal & Oil Co. v. Barker*, 117 Tex. 418, 427, 6 S.W.2d 1031, 1034 (1928). The plaintiff's expert should, after examining relevant information from the field and surrounding wells, give an opinion as to the probability of obtaining production and the extent of such production from the land in question. *See Reeder*, 320 S.W.3d at 448.

The nature of the inquiry makes it practically impossible to ascertain with certainty the exact amount of the plaintiff's damage. *Barker*, 117 Tex. at 427, 6 S.W.2d at 1034; *Reeder*, 320 S.W.3d at 448. But damages must be established with reasonable certainty, not mathematical precision. *Reeder*, 320 S.W.3d at 448 (citing *O & B Farms, Inc. v. Black*, 300 S.W.3d 418, 422 (Tex.App.-Houston [14th Dist.] 2009, pet. denied)). If the best available evidence affords a reasonable basis for the fact finder to calculate damages, then recovery cannot be denied because the exact amount of damages cannot be ascertained. *Reeder*, 320 S.W.3d at 448; *Black*, 300 S.W.3d at 422. As a general rule, the fact finder has broad discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for their calculation. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 760 (Tex.App.-Dallas 2008, no pet.).

In the instant case, there is evidence that the success of the Moseley # 1 well was unique. It had produced oil continuously for more than sixty years with total production exceeding one million barrels. Moreover, the record reflects that at least two wells drilled within one-quarter mile of the Moseley # 1 well resulted in dry holes. Robert Ungerecht's expert testimony indicates that the oil produced by the Moseley # 1 well is located in a channel sand formation carved from a prehistoric river, the course of which meanders 7,500 feet beneath the earth's surface. As a result, even though the drilling of the Moseley # 1 well was successful, due to the changing course of oil within the meandering formation, there is no guarantee that any future well, even one drilled one hundred feet away, could duplicate its success. Hancock described the risk of drilling a dry hole in this situation as being analogous to a person's attempting to drop a drinking straw into the mouth of a soda bottle—if the person were to miss the opening of the bottle by even an inch, that person would be unable to remove any of the bottle's contents. From the bulk of the testimony of record, it is apparent that the successful drilling and long lasting productivity of the Moseley # 1 well was an extraordinary circumstance.

Furthermore, Hancock testified that there was no guarantee that DSB, which had acquired a new lease of the property by the time of trial, would attempt to drill another well. Moreover, the record reflects that another operator was less likely to undertake drilling a well in this area due to both the already extensive production life of the Moseley # 1 well and the cost of saltwater disposal, which for an operator other than DSB would reduce the likelihood of a profitable well.[4]

Ungerecht testified that there was additional risk that Basic's dropping tubing down the hole may have damaged the casing lining thousands of feet below the surface permitting saltwater from another

---

4. Hancock testified that DSB owned the only nearby saltwater disposal facility. Thus, because its cost of saltwater disposal was less than an operator that did not own a nearby saltwater disposal facility, DSB was able to operate the Moseley # 1 well at a lower cost.

reservoir to migrate into the Paluxy reservoir, thereby adversely affecting the porosity and permeability of the reservoir rock. Additionally, according to Ungerecht's testimony, Basic's attempts to salvage the Moseley # 1 well may have introduced damaging chemicals and drilling mud into the productive interval. The result of either of these scenarios, according to Ungerecht, is that a replacement well, even if it were not a dry hole, might not be capable of matching the production of the Moseley # 1 well.

Finally, Ungerecht testified that the average price of oil during the relevant two year time frame was in the eighty-four dollars per barrel range. Robert Radloff, the royalty owner's trustee, testified that the Moseley # 1 well had averaged 522.65 barrels per month during the year prior to the accident. Radloff also testified that the average price of oil during the relevant time period was eighty-four dollars per barrel. Ungerecht further testified that the predicted life span of the Moseley # 1 well, were it to resume production, was through 2021. Moreover, Ungerecht testified that there was a 35% likelihood of any future well's being a dry hole. Ungerecht used this percentage to reduce the net present value[5] of the damages calculation. As a result, the royalty payments, based on this damages calculation, are likewise reduced by this risk factor.

Based on the aforementioned testimony, we conclude that there was sufficient evidence to support the damages awarded to the royalty owner. The record supports that there is a strong possibility that the royalty owner would not recover all of its interest in the formation under the land. Alternatively, there is evidence supporting that any future wells would be unable to duplicate the production of the Moseley # 1 well. As set forth above, the damages awarded to the royalty owner were based on net present value reduced by a 35% risk factor to account for the possibility of a dry hole. We stress that while damages must be established with reasonable certainty, mathematical precision is not required. *See Reeder,* 320 S.W.3d at 448; *Black,* 300 S.W.3d at 422. As such, we conclude that the record supports the establishment of these damages with the requisite reasonable certainty.[6]

Basic's fourth issue is overruled.

### EXPERT TESTIMONY

 In its fifth issue, Basic argues that the trial court erred in permitting Radloff to testify as an expert concerning the average price of oil over a period of time when the royalty owner had not identified him as an expert.

 Assuming arguendo that the trial court erroneously permitted Radloff's alleged expert testimony, error in the admission of evidence will be deemed harmless if the objecting party permits the admission of the same or similar evidence without objection. *See Volkswagen of America, Inc. v. Ramirez,* 159 S.W.3d 897, 907 (Tex. 2004); *Richardson v. Green,* 677 S.W.2d 497, 501 (Tex.1984); *Am. Prot. Ins. Co. v. Johnson,* 171 S.W.3d 921, 923 (Tex.App.-Amarillo 2005, no pet.).

In the case at hand, prior to Radloff's testifying, Ungerecht testified that the average price of oil during the relevant two year time frame was in the eighty-four dollars per barrel range. Basic made no

---

5. According to Ungerecht, he also applied a 10% annual discount factor for computing the net present cash value of anticipated cash flows from hypothetical future production.

6. We note that our holding is limited to the facts of this case, which concern extraordinary circumstances. Were the facts before us not so novel, our holding may have differed.

objection to this testimony. Accordingly, we conclude that error, if any, in the admission of Radloff's testimony was harmless. *See Ramirez,* 159 S.W.3d at 907; *Green,* 677 S.W.2d at 501; *Johnson,* 171 S.W.3d at 923. Basic's fifth issue is overruled.

### ROYALTY OWNER'S STANDING UNDER THE *DTPA*

In its sixth issue, Basic argues that the royalty owner has no standing to sue under the DTPA because it had no connection with or involvement in DSB's transaction with Basic for the work on the well. The royalty owner responds that even assuming it did not have standing to sue under the DTPA, its award of damages and attorney's fees is still proper under its breach of warranty claim, which Basic did not challenge on appeal. Basic responds that it challenged the trial court's findings of fact and conclusions of law pertaining to the royalty owner's breach of warranty claim as part of its seventh issue.

### *Common Law Breach of Implied Warranty*

In its seventh issue, Basic argues, in pertinent part, as follows:

> Based upon the evidence, arguments, and authorities presented above at pages 38–42, which are incorporated herein by reference, there is no evidence to support the following findings of fact 12–13 and conclusions of law 3, 4, 6–15:
>
> . . . .

7. In its reply brief, Basic specifically urges that its challenge to the royalty owner's breach of warranty claim must succeed based on its argument in its fourth issue that the royalty owner's damages are erroneous and due to the fact that liability was contested at trial. *See* Tex.R.App. P. 44.1(d).

8. The trial court's conclusion of law number five states as follows:

> 6. Defendant's breach of its warranty directly and/or proximately caused all damages Plaintiff and Intervenors claim in this action. . . . Further, Defendant's breach caused Intervenors lost royalties from the well.
>
> . . . .

Alternatively, any evidence in support of such findings and conclusions is so factually insufficient that it requires a reversal and remand for a new trial.

It is apparent from the language employed by Basic that its challenges to the sufficiency of the evidence underlying the trial court's findings and conclusions pertaining to its breach of warranty claim are limited to the bases urged in support of its fourth and fifth issues.[7] Having considered these arguments, we have overruled Basic's fourth and fifth issues. For these same reasons, we likewise conclude that Basic's challenges to the trial court's findings of fact and conclusion of law 6 pertaining to the royalty owner's breach of warranty claim in its seventh issue are not meritorious. Basic challenged the trial court's conclusion of law number five,[8] which pertains to the issue of breach of warranty, in its third issue, but only with regard to DSB. Basic has not challenged that conclusion of law with regard to the royalty owner. *See, e.g., Nobility Homes of Tex., Inc. v. Shivers,* 557 S.W.2d 77, 83 (Tex. 1977). To the extent that Basic's seventh issue pertains to the royalty owner's breach of warranty claim, it is overruled.

> Defendant failed to perform the services in a good and workmanlike manner in that Defendant's personnel failed to properly secure or handle the tubing as they placed it back into the well, dropping the tubing string into the well, damaging the well bore and irreparably damaging the well, and breaching Defendant's implied warranty of good and workmanlike services.

Accordingly, we hold that the royalty owner may recover the damages awarded based on its breach of implied warranty claim.[9] *See Melody Home Mfg. v. Barnes,* 741 S.W.2d 349, 354 (Tex.1987); *see also City Pub. Serv. Bd. v. Gen. Elec. Co.,* 935 F.2d 78, 80–81 (5th Cir.1991) (claim for breach of implied warranty of good and workmanlike performance of repair available at common law).

However, recovery of attorney's fees for a common law breach of implied warranty claim is not authorized by statute. *See 7979 Airport Garage L.L.C. v. Dollar Rent A Car Sys.,* 245 S.W.3d 488, 509 n. 31 (Tex.App.-Houston [14th Dist.] 2007, pet. denied). Therefore, we next consider whether the royalty owner had standing as a consumer under the DTPA.

### Consumer Status under the DTPA

To prove an action for violation of the DTPA, the plaintiff must establish its status as a consumer. *See Doe v. Boys Clubs,* 907 S.W.2d 472, 478 (Tex.1995); *Richardson–Eagle, Inc. v. William M. Mercer, Inc.,* 213 S.W.3d 469, 478 (Tex. App.-Houston [1st Dist.] 2006, pet. denied). To prove consumer status under the DTPA, the plaintiff must establish it was a person or entity that sought or acquired goods or services by purchase or lease. *See* Tex. Bus. & Com.Code Ann. § 17.45(4) (Vernon 2011); *Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 649 (Tex.1996); *see also Hedley Feedlot, Inc. v. Weatherly Trust,* 855 S.W.2d 826, 833–34 (Tex.App.-Amarillo 1993, writ denied) (trust not prevented from being consumer under DTPA); *NationsBank of Tex., N.A. v. Akin, Gump, Hauer & Feld, L.L.P.,* 979

S.W.2d 385, 391 (Tex.App.-Corpus Christi 1998, pet. denied) (representative of estate and trust a consumer under the DTPA).[10]

### Stipulation to Consumer Status

The royalty owner first argues that Basic stipulated to the royalty owner's consumer status. A stipulation is an agreement, admission, or other concession made in a judicial proceeding by the parties or their attorneys. *Rosenboom Mach. & Tool, Inc. v. Machala,* 995 S.W.2d 817, 821 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). A stipulation constitutes a binding contract between the parties and the court. *Id.* at 821–22. In any case, the issues to be tried may be limited or excluded by stipulation. *Id.* at 822. Where a stipulation limits the issues to be tried or considered by the jury, those issues are excluded from consideration. *Id.* Moreover, a stipulation obviates the need for proof on the litigable issue. *Id.*

While parties may stipulate to facts, neither courts nor the parties are bound by stipulations to legal conclusions to be drawn from the facts of the case. *See Caprock Inv. Corp. v. F.D.I.C.,* 17 S.W.3d 707, 713 (Tex.App.-Eastland 2000, pet. denied); *Martinez v. Hardy,* 864 S.W.2d 767, 770 (Tex.App.-Houston [14th Dist.] 1993, no writ); *Cartwright v. MBank Corpus Christi, N.A.,* 865 S.W.2d 546, 549 (Tex.App.-Corpus Christi 1993, writ denied). Whether a party is a consumer under the DTPA is a question of law. *Vinson & Elkins v. Moran,* 946 S.W.2d 381, 406 (Tex.App.-Houston [14th Dist.] 1997, writ dism'd by agr.). The existence of the underlying facts that give rise to consumer standing, however, may

---

9. Based on our reading of the pleadings, we conclude that this breach of implied warranty claim was not brought under the DTPA.

10. Basic has not argued that the royalty owner cannot be a consumer because it is a trust, which is not among the entities listed in Section 17.45(4). *See* Tex. Bus. & Com Code Ann. § 17.45(4).

be factual issues for the jury. *Martinez,* 864 S.W.2d at 770.

▪ In the instant case, the royalty owner argues that Basic stipulated its consumer status in the joint pretrial order dated September 30, 2008. Specifically, under a heading entitled Admissions of Fact, Basic states, Intervenors are 'consumers' as that term is defined in the Deceptive Trade Practices Act. In spite of the heading, Basic has not stipulated to any underlying facts that might give rise the royalty owner's consumer status. To the contrary, Basic's stipulation relates to a legal conclusion, *see Moran* 946 S.W.2d at 406, and is, therefore, not determinative on the issue of the royalty owner's consumer status. *See Caprock Inv. Corp.,* 17 S.W.3d at 713; *Martinez,* 864 S.W.2d at 770; *Cartwright,* 865 S.W.2d at 549.

*Analysis of Royalty Owner's Consumer Status Under Incidental Beneficiary Theory*

▪ In determining the plaintiff's consumer status, the focus is on the plaintiff's relationship to the transaction, not on the plaintiff's contractual relationship with the defendant. *See Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 815 (Tex.1997). Privity of contract with a defendant is not required for the plaintiff to be a consumer. *Amstadt,* 919 S.W.2d at 649 (citing *Home Sav. Ass'n v. Guerra,* 733 S.W.2d 134, 136 (Tex.1987); *Kennedy v. Sale,* 689 S.W.2d 890, 892–93 (Tex.1985); *Flenniken v. Longview Bank & Trust Co.,* 661 S.W.2d 705, 707 (Tex.1983); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540–41 (Tex.1981)). Instead of privity, the plaintiff is required to show that the defendant was connected with the transaction. *See Amstadt,* 919 S.W.2d at 650–51. That is, the plaintiff must show its transaction was connected with the defendant through (1) a representation by the defendant that

reached the plaintiff or (2) a benefit from the plaintiff's transaction that reached the defendant. *See, e.g., Todd v. Perry Homes,* 156 S.W.3d 919, 922 (Tex.App.-Dallas 2005, no pet.) (home builder had no connection with plaintiff's purchase of home because plaintiff did not contract with, receive representations from, or confer benefits on home builder).

The legislature has mandated that the DTPA be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection. TEX. BUS. & COM.CODE ANN. § 17.44 (Vernon 2011). In our analysis, we are mindful that the focus is on the plaintiff's relationship to the transaction, not on the plaintiff's contractual relationship with the defendant. *See Perry Equip. Corp.,* 945 S.W.2d at 815. The only requirement is that the goods or services sought or acquired by the consumer form the basis of his complaint. *Kennedy v. Sale,* 689 S.W.2d 890, 893 (Tex.1985) (employee was consumer under group insurance policy where employer had purchased and paid for policy).

Here, Basic argues that the royalty owner does not have the requisite connection to the transaction between Basic and DSB because (1) it did not communicate with DSB to make sure it operated the well properly, (2) it did not receive any information from DSB about how DSB conducted its activities, (3) it did not hire Basic to do any work on the well, (4) it did not have a contract with Basic, (5) it did not have any communications with anyone at Basic, (6) it was not present at the well and had no knowledge of the incident, and (7) it first acquired knowledge concerning the damage to the well when it received a

letter from DSB after the incident. In essence, Basic contends that the royalty owner is no more than an incidental beneficiary. *See, e.g., Moran,* 946 S.W.2d at 407.

In *Moran,* beneficiaries under a will sued the law firm hired by the executor to assist with the administration of the estate. *Id.* at 408. There, the court of appeals distinguished the supreme court's holding in *Kennedy,* stating that the court did not address consumer status in a situation in which the goods or services are purchased for the primary benefit of the actual purchaser, but incidentally benefit a third party. *See Moran,* 946 S.W.2d at 407. Instead, the court determined the rule employed in *Brandon v. American Sterilizer Co.,* 880 S.W.2d 488 (Tex.App.-Austin 1994, no writ) was more instructive. *See Moran,* 946 S.W.2d at 407. In *Brandon,* the court held that when the goods or services are purchased for the primary purpose of benefitting the business, and any use or benefit of those products extends to an employee only incidentally, the employee does not have standing to sue under the DTPA. *See Brandon,* 880 S.W.2d at 492. Thus, the court in *Brandon* held that the relevant issue was the purpose behind the purchase of the goods or services. *See id.* Based on this reasoning, the court in *Moran* concluded that the executors' purpose in hiring the law firm was to obtain legal services for the administration of the estate. *See Moran,* 946 S.W.2d at 408. The court further determined that even though the benefit of these services would obviously extend to the beneficiaries in the form of a more orderly administration, this benefit derived by the beneficiaries was merely incidental to the main purpose of the transaction—legal assistance to the executors. *See id.*

The supreme court has discussed this "incidental beneficiary" theory in *Arthur*

*Andersen & Co. v. Perry Equip. Corp.* In that case, Perry, as a condition of sale, insisted that Maloney Pipeline Systems, the company being sold, provide it with audited financial statements. *See Perry Equip. Corp.,* 945 S.W.2d at 814–15. Maloney hired Andersen to perform the audit. *See id.* at 814. Perry then relied on the statements in the audit in reaching its decision to purchase Maloney. *See id.* at 815. Perry later sued Andersen under the DTPA claiming the audit was faulty for favorably reporting Maloney's financial condition when, in fact, the company was suffering substantial losses. *See id.* at 814. In determining that Andersen was a consumer under the DTPA, the court reasoned that although Perry was not the actual purchaser, it was the beneficiary of those goods or services. *See id.* at 815. The court elaborated on its holding, stating that the audit was rendered in connection with the sale of Maloney, was specifically required by Perry, and was intended to benefit Perry. *See id.* Moreover, the court stated that Andersen was aware that Perry had required the audit and would rely on its accuracy and knew the specific purpose for which the audit was conducted. *See id.*

The facts of the instant case are distinguishable from the facts of *Perry* and more analogous to the facts in *Moran.* Here, though the stated purpose of DSB's transaction with Basic was to get the well back on production, it is not apparent from the evidence of record that DSB entered into the transaction with the intention of benefitting the royalty owner. DSB's role as operator resulted from its contractual agreement with the working interest owners. Under the terms of the joint operating agreement, DSB's obligation to maintain the well was to the working interest owners, who were parties to that agreement. Any benefit from DSB's purchase of Basic's services would obviously extend

to the royalty owner. However, the record does not reflect anything but that this benefit to the royalty owner was purely incidental. *See, e.g., Moran,* 946 S.W.2d at 408. Therefore, we hold that the royalty owner, as an incidental beneficiary of the transaction between DSB and Basic, is not sufficiently connected with that transaction to be a consumer under the DTPA. Basic's sixth issue is sustained.

### CHALLENGES TO FINDINGS OF FACT AND CONCLUSIONS OF LAW

In its seventh issue, Basic challenges the trial court's findings of fact 12 and 13 and conclusions of law 3, 4, and 6–15. The stated bases of Basic's challenges are the arguments it made in support of its fourth, fifth, and sixth issues. Having considered these arguments, we have overruled Basic's fourth and fifth issues as well as its seventh issue to the extent that it pertains to the royalty owner's breach of warranty claim. For the reasons we overruled the aforementioned issues, we likewise conclude that Basic's challenges to the trial court's findings of fact 12 and 13 and conclusions of law 3, 4, 6, 8–13, and 15 with regard to the royalty owner are without merit.

However, we have sustained Basic's sixth issue. Accordingly, we conclude that Basic's challenge to the trial court's conclusion of law 7 is meritorious. As a result, we further conclude that Basic's challenge to the trial court's conclusion of law 14 is likewise meritorious. Therefore, we hold that because there is no cause of action upon which the trial court's awards of attorney's fees to the royalty owner can be based, the awards are improper. Basic's seventh issue is sustained in part on this basis. The remainder of Basic's seventh issue is overruled.

### CONCLUSION

Having sustained Basic's sixth issue and part of its seventh issue, we *reverse* the trial court's judgment with regard to the royalty owner's cause of action under the DTPA and *render* judgment that the royalty owner take nothing as to that cause of action. We further *modify* the trial court's judgment by deleting its awards of attorney's fees to the royalty owner. Having overruled Basic's first, second, third, fourth, and fifth issues and part of its seventh issue, we *affirm* the remainder of the trial court's judgment *as modified.*