

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-14-00220-CV

PEGGY JO IHNFELDT,                                                    APPELLANT
INDIVIDUALLY AND AS TRUSTEE
FOR THE ESTATE OF WILLIAM D.
IHNFELDT

V.

PAULA REAGAN                                                          APPELLEE

----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 2011-50885-367

----------

## MEMORANDUM OPINION[1]

----------

In 2009, before William D. Ihnfeldt's death, he and his wife Peggy Jo Ihnfeldt sold Paula Reagan unimproved land in Denton County. Part of the sale was financed by the Ihnfeldts. Reagan subsequently disputed the terms of the

---

[1]*See* Tex. R. App. P. 47.4.

sale when the trustee of deeds of trust purporting to secure the purchase price of four and one-half of the acres threatened foreclosure. Reagan maintained she had purchased the five acres for approximately $175,000 ($50,000 cash plus a $124,240 promissory note with a lien that would encumber only four of the five acres) but that William and Peggy, without her knowledge, conveyed her only one-half acre unencumbered and fraudulently executed promissory notes and deeds of trust purporting to encumber the other four and one-half acres. In contrast, Peggy, on her own behalf and on behalf of Williams's Estate[2] (collectively "the Ihnfeldts"), denied that she or William had fraudulently executed any documents and argued that Reagan had agreed to pay a total price of $871,200—effectively $172,240 per acre—and that only one-half acre was unencumbered. As a result of the dispute, Reagan sued the Ihnfeldts and others to void the allegedly fraudulent deeds of trust along with their corresponding notes.[3] A jury found in favor of Reagan. The Ihnfeldts brought this appeal from the judgment on the verdict in which they raise ten issues. We affirm.

---

[2]William died in May 2010.

[3]Reagan initially sought a temporary restraining order prohibiting the Ihnfeldts from foreclosing, which the trial court granted. The trial court also signed a temporary injunction prohibiting foreclosure.

**I. Reagan's "Fourth Amended Original Petition"**

### A. The Deal for $175,000 and the Revised Deal for Approximately $175,000

In her "Fourth Amended Original Petition," Reagan sued (1) William Tate, as substitute trustee under the purportedly fraudulent deeds of trust and fee attorney for Federal Title Company, which closed the transactions; (2) Rose Mary Kendrick, an escrow officer and a notary public; (3) William's Estate; and (4) Peggy, individually and as trustee for his Estate. In her petition, which raised numerous claims detailed below, Reagan stated that the original deal in August 2009 was for $175,000 for five acres and that she even tendered a check to the title company for $181,069.29. However, she explained how the deal was restructured before closing so that the Ihnfeldts "would carry a [n]ote in the amount of $124,240.00 on a portion of the Property" and that the title company refunded her $124,240.00.

### B. The Two Notes for $124,240—the One for Four Acres that Reagan Acknowledged Making and the Other One for One-Half Acre that she Maintained was Fraudulent

Reagan further asserted that the one-acre tract she thought she was getting outright was instead conveyed to her in two one-half acre tracts—a one-half-acre tract that was conveyed to her without any encumbrance and another one-half-acre tract that was encumbered by a deed of trust securing a $124,240 loan. She identified a "Warranty Deed with Vendor's Lien" and "Deed of Trust" that both show $124,240 was owed on one of the half-acre tracts as being

3

among the fraudulent documents. She also identified a note for $124,240 that purported to be a purchase money note for one of the half-acre tracts as fraudulent. She also noted that if the half-acre tract was foreclosed upon, a portion of the building she had subsequently built on the one-acre tract would end up being on property she no longer owned.

### C. An October 2009 Note in the Amount of $696,960 for the Remaining Four Acres Surfaces

Reagan also alleged that she discovered there was an October 21, 2009 purchase money note and deed of trust that she denied signing in the amount of $696,960 on the remaining four acres. She listed this note and deed of trust among the documents she alleged were fraudulent, as well as an October 21, 2009 warranty deed with vendor's lien purporting to convey to her the four acres subject to that note and deed of trust.

### D. Reagan's Causes of Action and the Various Relief She Sought

In her causes of action, Reagan consistently sought various damages and, in some instances, attorney's fees. Under the caption, "Fraud in a Real Estate [sic]," she sought damages and attorney's fees. For "Breach of Fiduciary Duty," she again sought damages and attorney's fees. Under her "Negligence" claim, she sought only damages. Under the sections, "Violation of Chapter 12 of the Texas Civil Practice and Remedies Code," "Civil Conspiracy," and "Deceptive Trade Practice," she sought damages and attorney's fees. Under a "Damages"

section, she sought special damages in the amount of $430,000 for "the cost of the building and improvements located on the Property."

She also sought the following declaratory judgment:

> c. That each Deed from the Ihnfeldt Defendants to the Plaintiff for the Property is void *ab initio*;
>
> d. That the purported Note and Lien in the amount of $696,960.00 is void and the corresponding Deed of Trust is of no force or effect;
>
> e. That the purported Note and Lien in the amount of $124,240.00 is void and the corresponding Deed of Trust is of no force or effect;
>
> f. That the consideration for the contracts of sale between the Ihnfeldt Defendants and the Plaintiff failed in whole or in part making the contractual obligations of the Plaintiff voidable.

In conjunction with her request for a declaratory judgment, she sought attorney's fees.

In conjunction with her breach of contract claim, she sought actual damages and attorney's fees. In the alternative, she sought "equitable [rescission] of all transactions forming the basis of this lawsuit with the Ihnfeldt Defendants and seeks her consequential damages in addition to the other stated damages." Before trial, however, Reagan abandoned her breach of contract claim.[4]

In her prayer, among other relief, Reagan sought that judgment be entered

> that each Deed from the Ihnfeldt Defendants to the Plaintiff for the Property is void *ab initio*; that the purported Note and Lien in the amount of $696,960.00 is void and the corresponding Deed of Trust is of no force or effect; that the purported Note and Lien in the

---

[4]She also abandoned her deceptive trade practice and negligence claims.

5

amount of $124,240.00 is void and the corresponding Deed of Trust is of no force or effect; that the consideration for the contracts of sale between the Ihnfeldt Defendants and the Plaintiff failed in whole or in part making the contractual obligations of the Plaintiff voidable; and for damages in an amount within the jurisdictional limits of the Court including actual damages, statutory damages and consequential damages; together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate, reasonable and necessary attorney fees; costs of Court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

As we construe her petition, Reagan sought to (1) stop the foreclosure, (2) void the various notes, deeds of trust, and warranty deeds that were inconsistent with the transaction she had agreed upon and were all the products of fraud, and (3) recover damages. She did not seek specific enforcement of the transaction as she understood it. She did not seek to quiet title in her name.

## II. The Business Relationships Between Reagan and William

Reagan testified at trial that she had known William for about twenty years in her capacity as an accountant. After working two years as a real estate agent for Realty Executives, Reagan became a real estate broker in 2008 and began working with William to learn from him.

When Reagan's office flooded in December 2008 or January 2009, she accepted William's invitation to move into his building because he had office space available. When tax season was over on April 15, 2009, Reagan testified that she started looking to either build a building or purchase a building. Reagan

6

testified that she had moved out of William's office space by June or July before he had passed away, which contextually would have been June or July 2009.[5]

Reagan testified that she regularly and frequently borrowed money from William. She testified that William even lent her money a week before he passed away. To generate income from the property after she bought it, Reagan said William even lent her $6,000 to purchase Christmas trees. In a videotaped deposition that was played to the jury, Reagan said, "I was very lax in all of this because Willie Ihnfeldt was my friend. I didn't anticipate nor ever dream I would have to do this. So I didn't and wasn't careful." She attended his funeral.

### III. Reagan's Testimony Regarding Her Purchase of the Five Acres in Dispute

#### A. One Acre for $50,000; Four Acres for an Approximately $125,000 Note

Reagan's version of the sale was that she initially agreed to purchase all five acres for $175,000 plus title expenses and commissions and had even procured a cashier's check for $181,060.29 payable to Federal Title Company. Before closing, however, Reagan testified she and William agreed to structure the deal differently. She explained that if she had paid the full amount, she would have had to seek additional funds to construct the office and retail building she

---

[5]Reagan said she stayed in William's office space through June or July 2010 before he passed away. Because William died in May 2010, and because Reagan's search for a building both began and ended in 2009, Reagan appears to have meant that she moved out of William's office space sometime in June or July 2009.

7

planned to build on the property. Reagan said that the revised deal was for her to pay $50,000 for the first acre and to carry a note to William and Peggy for $125,000 for the remaining four acres.[6] Federal Title Company sent her a check back for $121,089.64 after deducting closing expenses.

Reagan said there was only one closing, it was in August 2009, and she admitted attending it. She denied attending a second closing on October 21, 2009, at Federal Title Company.

Reagan testified that she did not have a signed copy of the $124,240 note for the four-acre tract that she admitted signing, and none of the defendants ever produced such a note. During the videotaped interview played to the jury, Reagan said that she did not have any documents supporting these transactions, although she did at one time, but she said that she had given them to William, who said he was going to make the corrections she had requested. According to Reagan, she never got them back from William. In other words, Reagan

---

[6]In her "Fourth Amended Original Petition," Reagan asserts that she and William agreed that the Ihnfeldts would "carry a Note in the amount of $124,240.00 on a portion of the Property." In their brief and reply brief, Appellants note that Reagan admitted signing a $124,240 note in her "Fourth Amended Original Petition" and argue that it was an admission of the $124,240 note for the half-acre tract. We agree that Reagan acknowledged agreeing to carry a note for $124,240; we disagree that she admitted that the note she agreed to was for the half-acre tract. Reagan indicated that she was aware that the one-acre tract was divided into two one-half-acre parcels and that the building she constructed straddled both half-acre tracts. She was also aware that if the property was foreclosed upon, portions of her building would be on the foreclosed-upon tract. She identified the "Warranty Deed with Vendor's Lien" for a half-acre tract for $124,240 and the corresponding deed of trust as two of the documents procured by fraud.

8

contended that she attended an August 2009 closing at which she signed a note and one HUD-1 Settlement Statement; she thought that in return, she received title to an unencumbered one-acre tract and an encumbered four-acre tract.

### B. The Documents Recorded August 20, 2009

### 1. Land Purchased Outright—Plaintiff's Exhibit 3

The documentation, however, reflected something different. Plaintiff's Exhibit 3 is a "Special Warranty Deed," recorded August 20, 2009, purporting to convey "Tract 1, 0.50 acre part of a 5.00 acre tract of land." But Exhibit "A," the property description attached to Plaintiff's Exhibit 3, described the land as "a 1.00 acre part of a 5.00 acre tract of land." Regarding consideration, the "Warranty Deed" provides, "Ten Dollars and other good and valuable consideration, the receipt of which is hereby acknowledged," but does not describe any notes or other consideration. Plaintiff's Exhibit 3 roughly corresponds to the property that Reagan testified she thought she was purchasing outright. However, because of the two different property descriptions, it is not clear whether this deed conveyed a half-acre tract or a full acre. Additionally, the effective date of the conveyance was August 12, 2008.

### 2. Half-Acre Tract Conveyed Subject to a $124,240 Lien— Plaintiff's Exhibits 1 and 2

Plaintiff's Exhibit 1 is a "Special Warranty Deed with Vendor's Lien," recorded August 20, 2009, for "Tract 2, 0.50 acre part of a 5.00 acre tract of land." Exhibit "A," the property description attached to this document,

9

consistently identifies the land in question as "Tract 2, 0.50 acre part of a 5.00 acre tract of land." The amount of the lien is identified as $124,240. Plaintiff's Exhibit 1 bears the notation, "After Recording Return to: Paula Reagan, 3001 Burwood, Roanoke, TX 76262," whereas Plaintiff's Exhibit 3 bears the notation, "After Recording Return to: Paula Reagan, 4001 Burwood, Roanoke, TX 76262."

Plaintiff's Exhibit 2 is a "Deed of Trust," recorded August 20, 2009, for "Tract 2, 0.50 acre part of a 5.00 acre tract of land" with an Exhibit "A"—the property description—also for "Tract 2, 0.50 acre part of a 5.00 acre tract of land."[7] This "Deed of Trust," dated August 11, 2009, listed a note in the amount of $124,240.

Although Plaintiff's Exhibits 1 and 2 would correspond to the amount of the note that Reagan described and admitted agreeing to, the deed conveys only one-half acre instead of four acres, and the deed of trust secures repayment of the note Reagan denied signing.

### 3. Nothing Recorded in August 2009 Regarding the Four Acres

In August 2009, nothing was recorded pertaining to the other four acres. As will be shown below, documents pertaining to the four-acre tract were supposedly not executed until October 2009 and not recorded until November 2009.

---

[7]This is Deed of Trust number 2009-100990 that the trial court's judgment subsequently expressly vacates.

**C. The Documents Recorded on November 12 and 16, 2009—
Plaintiff's Exhibits 4, 5, and 6**

Recorded November 12, 2009, Plaintiff's Exhibit 4 is a "Special Warranty Deed with Vendor's Lien." The amount of consideration includes a promissory note for $696,960, and the land is described as a "tract being a portion of the tract described in the deed to William D. Ihnfeldt and Peggy J. Ihnfeldt recorded under Document No. 2008-108762 . . . and enclosing 4.000 acres." The effective date is listed as October 20, 2009. The "After Recording, Return To: Federal Title, Inc. /WT, 1200 S. Main, Suite 1000, Grapevine, TX 76051 Attn: Rose Mary Kendrick."

Plaintiff's Exhibit 5 is a "Deed of Trust," also recorded on November 12, 2009.[8] The amount secured is a note for $696,960. The property description is the same as the description in the deed in Plaintiff's Exhibit 4. The "Deed of Trust" is dated October 20, 2009.

A few days later, on November 16, 2009, Plaintiff's Exhibit 6, a "Correction Special Warranty Deed," was recorded. The "Correction Special Warranty Deed" is, however, dated August 12, 2009. It provides,

> This deed is made in place of and to correct a deed from Grantor to Grantee dated August 12, 2008 and recorded under Instrument Number 2009-100991 in the Official Public Records of Denton County, Texas. By mistake that deed was dated August 12, 2008 when in fact it should have been dated August 12, 2009 and the legal description contained a legal [description] for a 1 acre tract

---

[8]This is Deed of Trust number 2009-131962 that the trial court's judgment subsequently vacates.

11

when in fact it should have been for a one half acre tract. This correction deed is made by Grantor and accepted by Grantee to correct that mistake, is effective on August 12, 2009, and in all other respects confirms the former deed.

Plaintiff's Exhibit 6, the "Correction Special Warranty Deed," purports to correct the discrepancy noted earlier in Plaintiff's Exhibit 3, the "Special Warranty Deed" for the land Reagan purchased outright. Exhibit "A" attached to the correction deed describes the property as "Tract 1, 0.50 acre part of a 5.00 acre tract of land." The "Correction Special Warranty Deed" resolves the conflict in favor of only a half-acre purchase instead of a full acre purchase. The return information for Reagan identifies the 4001 Burwood address.

Reagan denied having any knowledge of the correction deed. She testified that she never received a copy of this deed from either Federal Title Company or Denton County. She admitted owning the Burwood property but said her daughter lived there and never gave her any mail.[9] She denied accepting the changes that the correction deed recited. Further, she noted that there was no place for her signature on the correction deed.[10]

---

[9]Although she denied using this address, the HUD-1 she admitted signing in August 2009 lists the 4001 Burwood address as hers and shows the property as a one-half acre encumbered by a $124,240 note.

[10]The property code does not require a grantee's signature on a deed. *See* Tex. Prop. Code Ann. § 5.022 (West 2014).

### D. Reagan Denies the Veracity of the Documents

Reagan denied that the deal that William offered her was $50,000 for an unencumbered half acre, a $124,000 purchase money loan for another half acre, and the remaining four acres for a purchase money loan of $696,960. She denied ever signing a real estate note for $696,960.[11] She denied ever entering into a real estate contract to buy four acres of land for $696,960.

### E. The Building Reagan Constructed on the One-Acre Tract

Reagan spent $360,000 to build a 4,000 square foot building on the one-acre tract. She testified that William was with her when she applied for a building permit in Denton County. The building straddled the two one-half acre tracts.

### F. How and When Reagan Became Aware There was a Problem

Reagan testified that she only became aware of the problem in the fall of 2009 when Tate, as trustee under the deeds of trust, tried to evict her. She said

---

[11]The Ihnfeldts complain that Reagan did not expressly deny signing all the documents purportedly bearing her signature. Viewing the evidence in the light most favorable to the verdict, she did not have to. *See Principal Life Ins. Co. v. Revalen Dev., LLC*, 358 S.W.3d 451, 454 (Tex. App.—Dallas 2012, pet. denied) (stating that appellate courts review findings in the light most favorable to the verdict). Reagan acknowledged having difficulty recognizing her own signature. She admitted during her deposition giving a number of other people permission to sign her name on her behalf under varying circumstances. This led to the problem that, assuming someone was forging her signature, that forger might have been using one of these other signatures as the forger's model. Reagan also speculated that some of the signatures might have been cut and pasted. In a couple of instances, her signature appeared on a separate page, apart from the other signatures. Reagan could not explain what happened. All she could say was that these documents did not reflect the deal that she and William agreed upon and were, therefore, fraudulent. The jury found in Reagan's favor.

13

that she experienced a great deal of stress when Tate showed her a note showing that she owed $696,960. She explained, "It's over a half million dollars. I don't have a half million dollars."

**IV. Tate's, Kendrick's, and the Ihnfeldts' Version of Reagan's Purchase**

Peggy testified that she did not negotiate any contracts with Reagan. Peggy also testified that she did not attend any closings with Reagan in attendance. Peggy relied on her husband, William, to go over the documents with her and explain to her what he was doing.

Peggy's understanding was that they sold the five acres to Reagan in three separate pieces. They sold a half-acre tract for $50,000, a second half-acre tract for $124,240 as evidenced by a promissory note, and the remaining four acres for a promissory note of $696,960.[12] According to Peggy, the total sale was not for $175,000; rather, the total sale was for $871,200. According to Peggy, Reagan was not purchasing all five acres for $175,000 but was, instead, paying $174,240 per acre.

Kendrick, the notary, testified that she remembered the closing transactions and that she was 100% sure Reagan appeared in her office on

---

[12]The reporter's record shows Peggy testified that the second half-acre tract was sold for $224,000. It is not clear whether this is a typo in the reporter's record or whether she misspoke. The second half-acre tract was consistently identified by the defendants as being sold for $124,240. Peggy herself discusses the $124,240 promissory note without noting the discrepancy between this note and her earlier testimony that she thought it was $224,000.

August 12, 2009, and again on October 21, 2009. Her notary log, however, did not reflect that Reagan signed anything in either August or October 2009. None of the parties signed her notary log in August or October 2009.

Kendrick maintained that the property was sold in three different transactions. She described the sale of a half-acre tract, a sale of the second half-acre tract, and the sale of four acres. She denied forging Reagan's signature on any of the documents.

Tate also described three separate transactions. He described the sale of a half-acre tract, the sale of another half-acre tract for a $124,240 note, and the sale of four acres for a $696,960 note. William Tate recalled seeing Reagan in his office on October 21, 2009, but he denied witnessing her executing any documents. He too denied forging Reagan's signature on any of the documents.

**V. Jury Questions 1 and 4**

At the close of the evidence, the trial court granted the Ihnfeldts' motion for directed verdict on Reagan's conspiracy and fraud claims against Peggy individually. Accordingly, the jury questions were limited to William, Tate, and Kendrick.

The jury charge provided

QUESTION NO. 1:

Did any of the following individuals listed below commit fraud against Paula Reagan related to the purchase of the real property in Question?

Fraud occurs when:

15

(1) there is a false representation of a past or existing material fact, and

(2) the false representation is made to a person for the purpose of inducing that person to enter into a contract, and

(3) the false representation is relied on by the person entering into the contract.

Answer "Yes" or "No" for each person:

William D. Ihnfeldt:    <u>Yes</u>

William D. Tate:    <u>Yes</u>

Rose Mary Kendrick:    <u>No</u>

This question corresponds to fraud in real estate and stock transactions under section 27.01 of the business and commerce code. Tex. Bus. & Com. Code Ann. § 27.01(a) (West 2015).

The jury charge further provided

If you answered "Yes" to any of those persons listed in Question 1, then answer the following question only as to those persons. Otherwise, do not answer the following question regarding that person.

QUESTION NO. 4:

Did any of those persons listed below make, present, or use any of the closing documents with:

1. Knowledge that the document is a fraudulent lien or claim against real or personal property or an interest in real or personal property; and

2. Intent that the document be given the same legal effect as a document evidencing a valid lien or claim against real property or an interest in real or personal property; and

16

3. Intent to cause Reagan to suffer financial injury or mental anguish or emotional distress?

Answer "Yes" or "No" for each:

    a. William D. Tate:        <u>Yes</u>

    b. Rose Mary Kendrick:   <u>No</u>

    c. William D. Ihnfeldt:   <u>Yes</u>

This question corresponds to a cause of action for fraudulent liens or claims filed against real or personal property under section 12.002 of the civil practice and remedies code. Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a) (West Supp. 2016).

The parties reserved the declaratory judgment requests for the court, depending on the jury's findings.

## VI. The Trial Court's Judgment

### A. Tate and Kendrick

In addition to the above jury findings, the jury found that Tate and Kendrick had failed to comply with their fiduciary duties as escrow agents to Reagan and assessed damages. The jury also found that Tate was part of a conspiracy with William that damaged Reagan. Tate and Kendrick reached a post-verdict settlement with Reagan. In accordance with the agreement, the trial court subsequently signed a judgment notwithstanding the verdict in favor of Tate and Kendrick on March 14, 2014.

17

### B. The Ihnfeldts and the Property

On June 18, 2014, after a hearing on multiple post-trial motions, the trial court signed a final judgment against the Ihnfeldts with, in pertinent part, the following provisions.

1. Plaintiff Paula Reagan shall be entitled to a judgment on her claims for fraud and violations of the Texas Civil Practices and Remedies Code Section 12.002 *et. seq.* against the Defendant Estate of William D. Ihnfeldt and her attorney's fees as awarded by the jury for trial and appeal; and

2. The Court also having considered the evidence presented and the arguments of counsel finds that Plaintiff is also entitled to a Declaratory Judgment that the Notes and Deeds of Trust in favor of Peggy Ihnfeldt and William Ihnfeldt were procured by fraud and are therefore in all things cancelled and of no further force or effect and Paula Reagan is entitled to her attorney's fees in the amount of $125,000.00 . . . through trial and attorney's fees in the amount of $15,000.00 should an appeal be taken to the Court of Appeals, totaling $140,000.00.

. . . .

3. The Court pursuant to the Declaratory Judgment Actions finds the Notes and Deeds of Trust in this matter are a nullity and should be cancelled.

   IT IS THEREFORE ORDERED THAT the Deed of Trust, Instrument No. 2009-131962 recorded on November 12, 2009 by the County Clerk of Denton County, Texas is cancelled and of no further force or effect. The County Clerk shall file this Judgment in the same class of records as the subject documentation was originally filed, and the Court directs the County Clerk to index it using the same names that were used in indexing the subject document.

   IT IS THEREFORE ORDERED THAT the Deed of Trust, Instrument No. 2009-100990 recorded on August 20, 2009 by the County Clerk of Denton County, Texas is cancelled and of no further force or effect. The County Clerk shall file this Judgment

in the same class of records as the subject documentation was originally filed, and the Court directs the County Clerk to index it using the same names that were used in indexing the subject document.

IT IS THEREFORE ORDERED THAT the Note purportedly payable by Paula Reagan to Peggy Ihnfeldt and William Ihnfeldt in the original principal amount of $124,240.00 dated August 11, 2009 is cancelled and of no further force or effect.

IT IS THEREFORE ORDERED THAT the Note purportedly payable by Paula Reagan to Peggy Ihnfeldt and William Ihnfeldt in the original principal amount of $696,960.00 dated October 20, 2009 is cancelled and of no further force or effect.

In short, the trial court voided the fraudulent notes and deeds of trust about which Reagan complained. But the judgment does not rescind the deeds to Reagan, even the ones she claims were executed and recorded without her permission or knowledge and which she testified she did not accept. Although Reagan sought monetary damages (and although the jury awarded her monetary damages in the aggregate amount of $586,989), the judgment awards her no amount as damages.

### VII. First Issue:  Did the Trial Court Err by Voiding the Notes and Deeds of Trust but not Voiding the Underlying Deeds Themselves?

In the Ihnfeldts' first issue, they argue that the trial court erred when it partially voided the transaction because it allowed Reagan to keep title to the property but cancelled all the supporting notes and deeds of trust. They complain that Reagan has effectively repudiated the entire transaction but has been allowed to keep the benefits of the agreement, which they contend is improper. *See Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 664 (Tex. 2009).

19

They contend that, with limited exceptions, the rescission of a contract must be in toto. *See Costley v. State Farm Fire & Cas. Co.*, 894 S.W.2d 380, 387 (Tex. App.—Amarillo 1994, writ denied).

### A. Reagan Did Not Admit Signing the Vacated Note for $124,240 for the Half-Acre Tract

The Ihnfeldts assert that Reagan admitted signing a $124,240 note, so the trial court had no basis for cancelling the August 11, 2009 note that was admitted into evidence. We disagree. Reagan admitted signing a $124,240 note for the four-acre tract, but she said she did not know where it was. She consistently denied signing Plaintiff's Exhibit 16, the vacated note.

### B. Error not Preserved

The Ihnfeldts do not point out how they raised the complaint in the trial court or where the trial court made an adverse ruling. The clerk's record does not show they filed any post-judgment motion.

The rules of appellate procedure require that an appellant's brief contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex. R. App. P. 38.1(i). When appellate issues are not supported by argument, citations to the record, or legal authority, nothing is presented for review. *Hernandez v. Hernandez*, 318 S.W.3d 464, 465 (Tex. App.—El Paso 2010, no pet.). It is an appellant's burden to discuss his assertions of error, and appellate courts have no duty—or even the right—to perform an independent review of the record and the applicable law to determine

20

whether there was error.  *Id.* at 466.  Were appellate courts to do so, they would be abandoning their role as neutral adjudicators and become an advocate for that party.  *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.).  The Ihnfeldts have not shown us where in the record they brought this complaint to the trial court's attention or where the trial court ruled adversely to them.  *See* Tex. R. App. P. 33.1(a).  We hold that this complaint was not preserved.

### C. Whether the Judgment Gives Reagan a Windfall

Part of the Ihnfeldts' complaint is that the judgment allows Reagan to keep the five acres without having to pay for them.  This complaint underscores the necessity of showing where they preserved their complaint at trial.

The jury awarded monetary damages against William that the trial court did not include in the judgment.  Question 2 awarded damages for amounts paid for ad valorem taxes, monies paid to the title company, and monies paid to the defendants in an aggregate amount of $36,989.  In Question 3, the jury awarded damages in the amount of $550,000 "that were a natural, probable, and foreseeable consequence of the actions found Question 1."  The judgment reflects monetary awards only for attorney's fees but not for any damages.  It appears that Reagan was awarded title to the five acres in lieu of the monetary damages.  The postverdict hearing shows that this is precisely what happened.  Reagan opted to retain unencumbered title to the five acres instead of the monetary damages.

21

Reagan's attorney took the position that the declaratory judgment action did not encompass the warranty deeds themselves but encompassed only the promissory notes and the deeds of trust; consequently, if Reagan recovered monetary damages, Reagan would effectively receive a double recovery, that is, both title to the five acres and monetary damages. Counsel for the Ihnfeldts argued that Reagan's declaratory judgment action sought to void the notes, the deeds of trust, and the warranty deeds as well and, citing *Cunningham v. Parkdale Bank*, asserted that Reagan could not keep title to the properties because her pleadings did not support that relief. 660 S.W.2d 810, 813 (Tex. 1983) ("[A] judgment must be supported by the pleadings and, if not so supported, it is erroneous."). Reagan's attorney ultimately argued that Reagan elected not to take the monetary damages and to take instead the cancellation of the notes and deeds of trust, leaving the deeds themselves in Reagan's name. Minutes later, the Ihnfeldts' counsel argued that Reagan had to choose between her declaratory judgment relief and the monetary damages because anything else would amount to a double recovery. In their brief, the Ihnfeldts do not address the postverdict hearing at all. We decline to advocate on their behalf that they preserved their complaint at that hearing. *See Valadez*, 238 S.W.3d at 845.

We overrule the Ihnfeldts' first issue.

## VIII. Second Issue: Was a Declaratory Judgment an Available Remedy?

In the Ihnfeldts' second issue, they argue that the trial court erred by granting a declaratory judgment in the final judgment because a declaratory judgment is not available to contest the validity of a lien. The Ihnfeldts contend that Reagan essentially brought a suit to quiet title and that she brought the declaratory judgment action simply to recover her attorney's fees. Citing *Southwest Guaranty Trust Co. v. Hardy Road 13.4 Joint Venture*, they contend this is improper. *See* 981 S.W.2d 951, 956–57 (Tex. App.—Houston [1st Dist.] 1998, pet. denied).

The Ihnfeldts are raising the issue for the first time on appeal. At the postverdict hearing, the Ihnfeldts argued that Reagan's declaratory judgment action encompassed the deeds as well as the deeds of trust and the notes. There was no complaint that a declaratory judgment was an improper procedural vehicle. The Ihnfeldts asked the trial court to deny the declaratory judgment, but in the context of the hearing, they were asking the trial court to deny it on the merits. Similarly, postjudgment, the Ihnfeldts filed no motion asserting that a declaratory judgment was an improper form of relief. Because the Ihnfeldts make this complaint for the first time on appeal, we hold that they failed to preserve any alleged error. *See In re R.A.*, 417 S.W.3d 569, 577 (Tex. App.—El Paso 2013, no pet.) (citing *Ortiz v. Collins*, 203 S.W.3d 414, 427 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *Holland v. Hayden*, 901 S.W.2d 763, 765 &

n.5 (Tex. App.—Houston [14th Dist.] 1995, writ denied)); *see also* Tex. R. App. P. 33.1; Tex. R. Civ. P. 329b(g).

We overrule the Ihnfeldts' second issue.

### IX. Third Issue: Did the Trial Court Use the Declaratory Judgment Action to Determine Facts?

In their third issue, the Ihnfeldts argue that the trial court erred to the extent the declaratory judgment is based on facts not determined by the jury. The Ihnfeldts contend that it was improper for the judgment to include a declaratory judgment that "the Notes and Deeds of Trust in favor of Peggy Ihnfeldt and William Ihnfeldt were procured by fraud" because that was properly a question for the jury. The Ihnfeldts complain that the trial court could not act as an additional finder of fact.

The Ihnfeldts' complaint targets paragraph 2 of the trial court's judgment. The Ihnfeldts rely on *Indian Beach Property Owners' Ass'n v. Linden*, 222 S.W.3d 682, 699 (Tex. App.—Houston [1st Dist.] 2007, no pet.). In that case, the trial court's judgment contained both declarations of fact and declarations of the parties' rights; the court of appeals simply removed the declarations of facts but left in place the declaration of the parties' rights and overruled the appellant's complaint. *Id.* at 699–700.

Once again, however, the Ihnfeldts are raising a complaint for the first time on appeal. They filed no post-judgment motion complaining about any alleged usurpation of the jury's fact-finding role. We hold that they failed to preserve any

24

alleged error. *See R.A.*, 417 S.W.3d at 577; *Ortiz*, 203 S.W.3d at 427; *Holland*, 901 S.W.2d at 765 & n.5; *see also* Tex. R. App. P. 33.1; Tex. R. Civ. P. 329b(g).

We overrule the Ihnfeldts' third issue.

## X. Fourth Issue: Was the Declaratory Judgment Relief Duplicative of Relief Sought in Other Causes of Action?

In their fourth issue, the Ihnfeldts contend that the trial court erred by granting the declaratory judgment because Reagan sought the same relief in her declaratory judgment action as she sought in her other causes of action. They argue that a party may not use a declaratory judgment action to seek the same relief afforded under another of its causes of action in order to obtain attorney's fees. *See Tanglewood Homes Ass'n v. Feldman*, 436 S.W.3d 48, 70 (Tex. App.—Houston 14th Dist. 2014, pet. denied); *City of Houston v. Texan Land & Cattle Co.*, 138 S.W.3d 382, 392 (Tex. App.—Houston [14th Dist.] 2004, no pet.). They then argue that the relief Reagan sought could have been independently provided under one of her other causes of action.

As with the Ihnfeldts' other issues involving the declaratory judgment action, they are raising these complaints for the first time on appeal. The Ihnfeldts never gave the trial court an opportunity to address and, if necessary, correct any of these purported errors. *See Valdez v. Valdez*, 930 S.W.2d 725, 728 (Tex. App.—Houston [1st Dist.] 1996, no writ). We hold that they failed to preserve any alleged error. *See R.A.*, 417 S.W.3d at 577; *Ortiz*, 203 S.W.3d at

25

427; *Holland*, 901 S.W.2d at 765 & n.5; *see also* Tex. R. App. P. 33.1; Tex. R. Civ. P. 329b(g).

We overrule the Ihnfeldts' fourth issue.

**XI. Fifth Issue: Was the Evidence Legally and Factually Sufficient?**

In the Ihnfeldts' fifth issue, they argue that the trial court erred in finding liability for statutory fraud and rendering a declaratory judgment based thereon because (1) there was no evidence of a false representation of a past or existing material fact, (2) there was no evidence of Reagan's reliance on anything that William communicated to her, and (3) there was no evidence of damages proximately caused by William. In the alternative, they contend that the jury verdict is against the great weight and preponderance of the evidence. We construe the Ihnfeldts' brief as attacking both the factual and legal sufficiency of the evidence.

**A. Factual Insufficiency**

A motion for new trial is a prerequisite to attacking the factual insufficiency of the evidence to support a jury finding. Tex. R. Civ. P. 324(b)(2). The Ihnfeldts did not file a motion for new trial attacking any of the jury findings. We hold that they have waived their factual insufficiency challenges. *See id.*

**B. Legal Insufficiency**

In a jury trial, no-evidence and matter-of-law issues or points must be preserved through one of the following procedural steps in the trial court:

(1)    a motion for instructed verdict;

(2)   a motion for judgment notwithstanding the verdict;

(3)   an objection to the submission of the question to the jury;

(4)   a motion to disregard the jury's answer to a vital fact question; or

(5)   a motion for new trial.

*Nat'l Western Life Ins. Co. v. Newman*, No. 02-10-00133-CV, 2011 WL 4916434, at *5 (Tex. App.—Fort Worth Oct. 13, 2011, pet. denied) (mem. op. on reh'g) (citing *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992)); *see also* Tex. R. Civ. P. 324(b) (listing appellate complaints that must be preserved by a motion for new trial).  The Ihnfeldts filed a motion to disregard jury findings.  At the hearing on the motion to disregard jury findings, the Ihnfeldts argued there was no evidence that William made a past or present misrepresentation to Reagan.  In their motion, they asserted that Reagan "produce no evidence of any damages as a result of any conduct by Defendant Ihnfeldt."  At the hearing, they also complained about the reasonableness of the costs of the improvements to the land.

Attacks on the legal sufficiency of the evidence are addressed as either "no evidence" or "matter of law" points.  *Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 425 (Tex. 2015); *Gooch v. Am. Sling Co., Inc.*, 902 S.W.2d 181, 183–84 (Tex. App.—Fort Worth 1995, no pet.).  If the complaining party had the burden of proof at trial, then the appellant addresses the error as a "matter of law" point.  *Envtl. Processing Sys., L.C.*, 457 S.W.3d at 425.  If the complaining party did not have the burden of proof, then it addresses

27

the error as a "no evidence" issue. *Id.* As the defendants, the Ihnfeldts did not have the burden of proof at trial; therefore, their complaint is a "no evidence" one.

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); *Gooch*, 902 S.W.2d at 184. There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Town of Flower Mound v. Teague*, 111 S.W.3d 742, 752 (Tex. App.—Fort Worth 2003, pet. denied) (op. on reh'g); *Gooch*, 902 S.W.2d at 184. When determining whether there is legally sufficient evidence to support the finding under review, we view the evidence in the light most favorable to the finding, crediting favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not, and indulging every reasonable inference in support of that finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Moreover, "[j]urors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to

28

believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary." *Id.* at 819.

A promise to do an act in the future is actionable fraud when the promise is made with the intention, design, and purpose of deceiving and with no intention of performing the act. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). A party's intent is determined at the time the party made the representation and may be inferred from the party's subsequent acts after the representation is made. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). Intent is a fact question uniquely within the realm of the trier of fact because it depends on the credibility of the witnesses and the weight to be given their testimony. *Id.* Failure to perform, standing alone, is no evidence of a party's intent not to perform when the promise was made; however, that fact is a circumstance to be considered with other facts to establish intent. *Id.* at 435. Because the intent to defraud is not susceptible to direct proof, it must invariably be proven by circumstantial evidence. *Id.* When considered with the breach of a promise to perform, slight circumstantial evidence of fraud is sufficient to support a finding of fraudulent intent. *Id.*

For the reasons set out below, we hold that there was legally sufficient evidence of a false representation of an existing material fact. Reagan testified that the deal she and William ultimately agreed to was for the purchase of one acre of land for $50,000 and the remaining four acres of land for a $125,000

29

loan, secured by a deed of trust on those four acres only. Reagan testified she subsequently discovered that the deal William later supported with documentation, some of which she never saw and some of which she testified had forged signatures, was for a half-acre tract for $50,000, a half-acre tract for a $124,240 loan, secured by a deed of trust, and the remaining four acres for a $696,960 loan, secured by a deed of trust. Viewing the evidence in the light most favorable to the jury's verdict, we hold that agreeing to sell the five acres for a total amount of $175,000 and then two months later filing documentation evidencing a sale of the same five acres for the total amount of $871,200, along with Reagan's testimony that William failed to provide her with a copy of the contract and note she admitted signing and the close relationship between William and Reagan, is more than a scintilla of evidence supporting the finding of a false representation of an existing material fact and, therefore, the evidence is legally sufficient to establish that William's initial agreement to sell all five acres for $175,000 was a present misrepresentation. *See id.* at 434 (stating that intent is uniquely within the realm of the trier of fact); *see also Principal Life Ins. Co.*, 358 S.W.3d at 454 (stating that appellate courts review findings in the light most favorable to the verdict); *Gooch*, 902 S.W.2d at 184 (stating that to sustain a no evidence complaint, the evidence of a vital fact must amount to more than a mere scintilla).

The Ihnfeldts argue that William may have initially entered the $175,000 deal in good faith, that is, without any false representation of a past or existing

material fact, and thereafter—in the future—decided to change the deal. At trial, the Ihnfeldts did not accord Reagan's version of the deal any legitimacy but asserted, instead, that there was but one deal, and that deal consisted of the sale of a half-acre tract for $50,000, the sale of a second half-acre tract for a $124,240 loan, and the sale of remaining four acres for a $696,960 loan. The Ihnfeldts never asserted the possibility or produced any evidence that there was any other deal, nor did they encourage to the jury to entertain the possibility that William ever agreed to a deal for $175,000 and, thereafter, decided unilaterally to change the deal to one for $871,200. Reviewing courts must assume that jurors decided all of the implicit factual questions in favor of the verdict if a reasonable person could do so. *See City of Keller*, 168 S.W.3d at 819. On these facts, there was more than a scintilla of evidence from which a reasonable human could find that the intent to falsely misrepresent a vital fact was there from the outset.

Regarding proximate cause, the components of proximate cause are cause in fact and foreseeability. *Ryder Integrated Logistics, Inc. v. Fayette Cty.*, 453 S.W.3d 922, 929 (Tex. 2015.). Proximate cause is ultimately a question for the trier of fact. *Id.*

The evidence showed that Reagan relied on William's representation that she was purchasing five acres for $175,000 and that William was aware that her plan was to put a building on the property. Reagan subsequently placed a building on the property. It was foreseeable that Reagan would balk at learning

31

she was paying $871,200, not $175,000, for the property and that she would be damaged if she placed half of her building on property that was foreclosed upon.

We hold that the evidence was legally sufficient to show that William made a false representation of an existing material fact. *See City of Keller*, 168 S.W.3d at 819. We further hold that the evidence was legally sufficient to show Reagan relied on the misrepresentations and that the misrepresentations were the proximate cause of Regan's damages. *See Ryder Integrated Logistics, Inc.*, 453 S.W.3d at 929. We overrule the Ihnfeldts' fifth issue.

### XII. Sixth Issue: What is the Effect of Linking Jury Question 4 (Fraud under the Texas Business and Commerce Code) to Jury Question 1 (Fraud under the Civil Practice and Remedies Code)?

In their sixth issue, the Ihnfeldts argue that the trial court erred when it rendered a final judgment finding liability because jury charge Question 4, which addressed fraud under Chapter 12 of the Civil Practice and Remedies Code, was predicated upon a finding of fraud under jury charge Question 1, which addressed fraud under section 27.01 of the Texas Business and Commerce Code. The jury was instructed to answer Question 4 only if it found fraud under Question 1. The Ihnfeldts contend there is no independent finding of fraud under Question 4, that is, that there is no independent finding of fraud under section 12.002 of the Texas Civil Practice and Remedies Code.

Once again, the Ihnfeldts are raising an issue for the first time on appeal. This complaint was not raised at the formal charge conference. The Ihnfeldts do not show us where this complaint was raised at the postverdict hearing. As

mentioned previously, the Ihnfeldts filed no postjudgment motion. It is not clear why the trial court made Question 4 contingent upon a finding of fraud under Question 1. However, as a logical matter, if there was no fraud under Question 1, there would be no fraudulent documents to file under Question 4. Conversely, if there was a fraud under Question 1, Question 4 was an attempt to identify who subsequently filed those fraudulent documents to perpetuate the fraud.[13] Regardless of the explanation, we hold that the Ihnfeldts failed to preserve any alleged error. *See R.A.*, 417 S.W.3d at 577; *Ortiz*, 203 S.W.3d at 427; *Holland*, 901 S.W.2d at 765 & n.5; *see also* Tex. R. App. P. 33.1; Tex. R. Civ. P. 329b(g).

We overrule the Ihnfeldts' sixth issue.

**XIII. Seventh Issue: Was the Award of Attorney's Fees under the Declaratory Judgments Act Proper?**

In their seventh issue, the Ihnfeldts argue that the trial court erred in awarding attorney's fees to Reagan under the declaratory judgments act because the declaratory judgment duplicated issues and remedies that were already before the trial court. The Ihnfeldts' arguments and authorities are the same as those asserted under their fourth issue attacking the declaratory judgment itself. Their seventh issue simply asserts that if the declaratory

---

[13]At the postverdict hearing, Reagan's counsel explained that procuring the fraudulent documents was one cause of action and filing them in a clerk's office was a second cause of action. The Ihnfeldts' counsel disagreed, argued it was all one fraud, and expressed concern that Reagan was seeking independent recoveries on both. No one, however, argued there was a flaw in either the jury charge or the jury verdict based upon linking Question 4 to Question 1.

33

judgment was improper, then any award of attorney's fees by virtue of the declaratory judgment was improper as well. We rely on our analysis of their fourth issue.

We overrule the Ihnfeldts' seventh issue.

## XIV. Eighth Issue: Were Reagan's Attorney's Fees Improperly Awarded for Lack of Supporting Documentation?

In their eighth issue, the Ihnfeldts argue that the trial court erred when it rendered judgment awarding Reagan her attorney's fees because no supporting documentation was submitted by Reagan's counsel. The Ihnfeldts' eighth issue is premised on the assumption that Reagan had to use the lodestar method of determining attorney's fees. The Ihnfeldts rely exclusively upon *El Apple I, Ltd. v. Olivas*, a case in which the lodestar method was required and in which the evidence was insufficient to show compliance with it. *See* 370 S.W.3d 757, 764 (Tex. 2012).

### A. Briefing Deficiency

An appellant's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex. R. App. P. 38.1(i). Appellate issues not supported by argument, citations to the record, or legal authority, present nothing for review. *Hernandez*, 318 S.W.3d at 465. Appellate courts have no duty—or even the right—to perform an independent review of the record and the applicable law to determine whether there was error. *Id.* If appellate courts were to do so, they would be

34

abandoning their role as neutral adjudicators and become an advocate for that party. *Valadez*, 238 S.W.3d at 845. In their brief, the Ihnfeldts have not shown us where in the record they brought this complaint to the trial court's attention or where the trial court ruled adversely to them. *See* Tex. R. App. P. 33.1(a).

### B. Our Own Review of the Record

Our review of the record shows Reagan's attorney, Roger Yale, testified that he had been a licensed attorney for nearly twenty years. He worked primarily in Denton, Collin, and Dallas Counties. Yale's hourly billing rate was $350 per hour, the attorney assisting Yale had an hourly billing rate of $200 per hour, and Yale's paralegal billed at $100 per hour. Yale testified that compared to hourly billing rates in Denton County, his hourly billing rates were in the mid-level range. He testified that Reagan hired him in January 2012, that he kept hourly billing records in this case, and that, in conjunction with this case, he prepared pleadings, responded to pleadings, propounded discovery with written questions and oral depositions, attended oral depositions, retained an expert, prepared for trial, defended a motion for summary judgment, and engaged in other motion practice before the court. Yale thought there were a couple of unique issues that might be questions of first impression. Yale stated that he and his firm spent a significant amount of time on the unique issues, and he noted too that this was a "heavy document case" requiring a significant amount of time. Yale testified that this was also a multiple cause of action case and identified the claims for fraud, violation of the Texas Property Code, the Texas Civil Practice

35

and Remedies Code, breach of fiduciary duty, and attorney's fees. He explained that because the causes of action were so intertwined, he was not able to segregate the attorney's fees among them. Yale testified that he and his staff spent over 450 hours on the case and that his total fees billed to date were about $125,000. Yale thought $125,000 would be an appropriate sum to compensate Reagan for her attorney's fees through trial. He also thought that it would cost $15,000 to successfully defend the case in the Fort Worth Court of Appeals and another $15,000 to successfully defend it in the Texas Supreme Court. When asked if Reagan's case had an effect on his ability to work for other clients, Yale responded, "[A]nytime that you spend the number of hours that we've spent, that precludes employment . . . with other clients." When asked why he thought these attorney's fees were necessary and reasonable, Yale responded that he thought they were reasonable because the agreement was hourly and not a contingency fee, because the issues were novel, because of "the type of case that has occurred," and because of his anticipation of success.

The only questions asked on cross-examination were regarding how much effort he had put into trying to segregate the fees, and Yale responded that he spent less than two hours trying to segregate the fees before determining it was not possible. There was no cross-examination regarding the reasonableness or necessity of the fees.

### C. Yale Relied on the Traditional *Arthur Anderson* Method of Calculating Attorney's Fees

When looking at Yale's testimony, he articulates a number of the factors listed in supreme court's *Arthur Anderson* opinion traditionally used when determining attorney's fees. *See Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). Those factors are (1) the time and labor required, the novelty and difficulty of the issues involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular case will preclude other employment by the attorney; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship the attorney has with the client; (7) the experience, reputation, and ability of the attorney or attorneys performing the services; and (8) whether the fee is fixed or contingent on the results obtained or the uncertainty of collection before the legal services have been rendered. *Id.*; *AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 517 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). Courts are not required to receive evidence on every one of those factors to award attorney's fees. *Ferrant v. Graham Assocs., Inc.*, No. 02-12-00190-CV, 2014 WL 1875825, at *8 (Tex. App.—Fort Worth May 8, 2014, no pet.) (mem. op. on reh'g). Under the traditional method of awarding attorney's fees, documentary evidence is not a prerequisite. *Id.* If the testimony regarding the hours of work

required is not speculative, time sheets or other detailed hour calculations are not required. *Id.* Under the traditional method of awarding attorney's fees, the first factor includes the time spent, and the third factor addresses the fee customarily charged in the locality. *See Arthur Anderson & Co.*, 945 S.W.2d at 818.

Consequently, even under the traditional method, we would expect to see testimony regarding how much time was put into the case and how much the attorney's time per hour was worth. *See AMX Enters., L.L.P.*, 283 S.W.3d at 514–21. "This court has declined to extend *El Apple* to require time records in all cases in which an attorney uses the attorney's hourly rate to calculate the fee." *Myers v. Southwest Bank*, No. 02-14-00122-CV, 2014 WL 7009956, at *6 (Tex. App.—Fort Worth Dec. 11, 2014, pet. denied) (mem. op.).

### D. The Lodestar Method

In contrast,

> when applying for a fee under the lodestar method, the applicant must provide sufficient details of the work performed before the court can make a meaningful review of the fee request. For the purposes of lodestar calculations, this evidence includes, at a minimum, documentation of the services performed, who performed them and at what hourly rate, when they were performed, and how much time the work required.

*El Apple I, Ltd.*, 370 S.W.3d at 764. Without evidence of the time spent on specific tasks, the fact finder has insufficient information to meaningfully review a fee request. *See Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014); *City of Laredo v. Montano*, 414 S.W.3d 731, 736–37 (Tex. 2013). On appeal, this is precisely the deficiency about which the Ihnfeldts complain.

38

### E.  What the Ihnfeldts Argued in the Trial Court

At the charge conference, the Ihnfeldts objection to the jury question on attorney's fees was that there was no evidence that the services were necessary. There was no mention of the lodestar method.  There was no reference to the *El Apple* opinion or any other case following it.

In the Ihnfeldts' "Motion to Disregard Jury Findings," they complained that there was no evidence to show that the attorney's fees were necessary.  They did not mention the lodestar method.  They did not cite the *El Apple* opinion or any comparable case.

At the hearing on the motion to disregard, the Ihnfeldts again argued the evidence was "insufficient as a matter of law" to support the jury's finding that the attorney's fees were necessary.  As before, there was no mention of the lodestar method and no reference to the *El Apple* opinion or its progeny.

The complaint that the evidence is insufficient to show the reasonableness and necessity of attorney's fees applies equally to both the lodestar and traditional methods of calculating attorney's fees.  The complaint itself does not tell us against which of the two methods the evidence should be measured.

### F. Complaint on Appeal Does Not Match Complaint at Trial

The complaint on appeal must be the same as that presented in the trial court.  *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997).  The Ihnfeldts in their brief do not direct us to where they asserted in the trial court that Reagan was proceeding under the lodestar method and failed to comply with it.  Our

independent review of the record does not show where any complaint based upon the lodestar method was ever raised. The Ihnfeldts' objection to the charge at the formal charge conference was based on the absence of any evidence that the fees were reasonable and necessary; they did not object on the basis that they were not supported by the proper documentation. Their objection at the postverdict hearing was also on whether the attorney's fees were reasonable and necessary. There was no complaint that Reagan was using the lodestar method and had failed to support her claim for attorney's fees with proper documentation. The argument on appeal must comport with the argument at trial. *See Basic Energy Serv., Inc. v. D-S-B Props., Inc.*, 367 S.W.3d 254, 264 (Tex. App.—Tyler 2011, no pet.). Their complaint is not preserved for appeal. *See id.* In our case, the record shows that Reagan was proceeding under the traditional method. Under the circumstances, we decline to hold that she elected to proceed under the lodestar system. Nothing in the record suggests the Ihnfeldts' objection was based on the lodestar method or *El Apple.* On this record, neither Reagan nor the trial court had fair warning that Reagan had opted for a different method of calculating attorney's fees that might require additional evidence. *See* Tex. R. App. P. 33.1(a). We decline to analyze the Ihnfeldts' sufficiency complaint using the lodestar method.

## G. Legal Sufficiency under the Traditional Method

To the extent that the Ihnfeldts' preserved their sufficiency complaint using the traditional method of calculating attorney's fees, although the uncontroverted

testimony of an interested witness generally does nothing more than create a fact issue, such testimony is taken as true as a matter of law if it is not contradicted by any other witness or by attendant circumstances and is clear, direct, positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion on it. *See AMX Enters., L.L.P.*, 283 S.W.3d at 519–20. This exception to the interested witness rule is especially true when opponents have the means and opportunity of disproving the testimony if it is not true and fail to do so. *Id.* at 520. "[T]he [attorney's] testimony is not conclusory when, as here, opposing counsel likewise has some idea of the time and effort involved and if the matter is truly in dispute, may effectively question the attorney about the reasonableness or necessity of his fee." *Ferrant*, 2014 WL 1875825, at *9. The evidence is sufficient to show Reagan had to hire an attorney to sue the Ihnfeldts to get relief. Although the Ihnfeldts complained the fees were unnecessary, they produced no evidence calling into doubt any of them and made no effort on cross-examination to question any portion of the fees. We hold that the evidence is legally sufficient to support the reasonableness and necessity of the attorney's fees under the traditional method.

We overrule the Ihnfeldts' eighth issue.

**XV. Ninth Issue: Did Reagan Need to Segregate Her Attorney's Fees?**

In the Ihnfeldts' ninth issue, they assert that the trial court erred when it awarded Reagan attorney's fees because her fees were not segregated. They complain that Reagan did not recover on all of her claims and that she did not

41

recover against all of the defendants—namely, Tate, Kendrick, and Peggy individually.[14]

However, they do not show where this complaint was preserved in the trial court. If no objection is made to the failure to segregate attorney's fees at the time the evidence of attorney's fees is presented or at the time of the charge, the error is waived. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997) ("[I]f no one objects to the fact that the attorney's fees are not segregated as to specific claims, then the objection is waived."); *Rotella v. Cutting*, No. 02-10-00028-CV, 2011 WL 3836456, at *7 (Tex. App.—Fort Worth Aug. 31, 2011, no pet.) (mem. op. on reh'g) (citing *Green Int'l, Inc.*, 951 S.W.2d at 389); *Holmes v. Concord Homes, Ltd.*, 115 S.W.3d 310, 313 (Tex. App.—Texarkana 2003, no pet.). We hold any alleged error based upon a failure to segregate was waived. *See Green Int'l, Inc.*, 951 S.W.2d at 389; *Rotella*, 2011 WL 3836456, at *7; *Holmes*, 115 S.W.3d at 313.

We overrule the Ihnfeldts' ninth issue.

**XVI. Tenth Issue: Did the Trial Court Err by Striking the Ihnfeldts' Counterclaim?**

In the Ihnfeldts' tenth issue, they argue that the trial court erred when it granted Reagan's motion to strike their original counterclaim for breach of the notes. On November 25, 2013, the Ihnfeldts filed an original counterclaim for

---

[14]Peggy, individually, is an appellant. She was a party to the invalidated notes and deeds of trust and was a grantor of the property awarded to Reagan.

breach of contract. Specifically, they asserted that Reagan had signed a promissory note for $124,240 for the purchase of a half-acre tract and had signed a second promissory note for $696,960 for the purchase of a four-acre tract. The Ihnfeldts asserted that Reagan had made only "approximately one years' worth of payments" on the note for $124,240 but "no others" and that she had not made any payments on the note for $696,960. The Ihnfeldts sought damages and attorney's fees.

On June 21, 2012, the trial court signed a "Scheduling Order" that made February 28, 2013, the deadline to amend pleadings. The Ihnfeldts' November 25, 2013 counterclaim missed that deadline. Trial started on December 2, 2013—seven days later. A party must seek leave of court to file an amendment after the deadline established by a scheduling order. Tex. R. Civ. P. 63. The Ihnfeldts never filed a motion for leave. Reagan, on the other hand, filed a motion to strike in which she argued, among other arguments, that the Ihnfeldts failed to seek leave of court.

At trial, counsel for the Ihnfeldts argued, "[T]he bottom line is, is if they succeed on their claims, then there is no breach of contract. But if they fail on their claims, there is a breach of contract because she's admitted there are no payments." Assuming, without deciding, that the trial court erred by striking the Ihnfeldts' counterclaim, we hold that they cannot show harm. Counsel for the Ihnfeldts admitted at trial that their counterclaim was moot if Reagan prevailed. Reagan prevailed. Only if Reagan lost were the Ihnfeldts in a position to be

43

prejudiced.  Because they lost, they never were in a position to be prejudiced by the trial court's ruling.  Tex. R. App. P. 44.1(a).  We overrule the Ihnfeldts' tenth issue.

### XVII. Conclusion

Having overruled all of the Ihnfeldts' issues, we affirm the trial court's judgment.


/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL:  GARDNER, MEIER, and GABRIEL, JJ.

GABRIEL, J., concurs without opinion.

DELIVERED:  December 1, 2016